<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

UBI TELECOM INC.,

                *Plaintiff,*

  v.

KDDI AMERICA, INC. and KDDI
CORPORATION,

           *Defendants.*

Civil Action No. 13-1643 (KSH) (CLW)

<u>**OPINION**</u>

---

KDDI AMERICA, INC.,

                *Plaintiff,*

  v.

UBI TELECOM, INC.,

           *Defendant.*

---

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.**    <u>**Introduction**</u>

      UBI Telecom Inc. ("UBI") and KDDI America, Inc. ("KDDI America") have sued each other for a variety of alleged wrongs relating to an arrangement between them to provide mobile telephone service and phones to a niche consumer market: Korean customers in the United States. UBI Telecom has also sued KDDI America's Japanese parent company, KDDI Corporation.

The defendants have filed the following motions: KDDI America has moved to dismiss counts four, five, six, and seven of UBI's complaint for failure to state a claim for which relief may be granted.  (D.E. 47.)  KDDI Corp. has moved to dismiss counts eight, nine, ten, and eleven of UBI's complaint for lack of personal jurisdiction and, in the alternative, for failure to state a claim.  (D.E. 46.)  Oral argument was held, and for the reasons set forth below, the motions will be granted in part and denied in part.

II.    **Factual Background**

   A. **Overview of the Business Relationship**

The facts as set out by UBI in its second amended complaint (D.E. 44 ("SAC")), which are taken as true for purposes of the motions to dismiss, paint the following picture.  The parties began working together in March 2010, with the goal of "jointly launch[ing] a mobile telephone service for Korean customers in the United States."  (SAC ¶ 6.)  Around that time, UBI was winding down another brand, Helio, under which it offered service in conjunction with Virgin Mobile.  (*Id.* ¶¶ 83-84; *see also id.* ¶ 15 (stating that UBI "arose from a prior start up business through which UBI's affiliate had performed marketing and sales support for a mobile handset service offered through SK Telecom").)

The basic plan was to migrate UBI's existing customer base over to KDDI's service and devices.  (*Id.* ¶ 84-85.)  KDDI America would bring to the table the "financial strength and . . . backing" of its parent, KDDI Corp., along with upgraded billing software, IT and automation support, and the ability to procure and supply network-compatible handsets (phones) and access to mobile air time. (*Id.* ¶¶ 10-12.)  KDDI America had the exclusive purchasing rights for these handsets.  (*Id.* ¶ 13.)  KDDI America did not want to launch the planned service in its own name, fearing risk to its brand, and did not want to take responsibility for customers or collecting

payments.  (*Id.* ¶ 9.)  UBI would contribute its expertise in marketing and sales, particularly with respect to the Korean market, and its Korean customer base.  (*Id.* ¶¶ 7-8, 16, 18.) "UBI had Korean customers, knowledge of the Korean marketplace and a desire to build a large and valuable mobile customer base that would create a long term revenue[/]profit stream for it." (*Id.* ¶ 18.)

Thus, according to UBI, the parties reached agreement to "launch a mobile business" in spring 2010 as follows.  (*See* SAC ¶ 21.)  KDDI America's "primary responsibilities would be to provide financial support to UBI, to provide air time at competitive rates for UBI's existing and future Korean Market customers, to procure and supply handsets to UBI for resale to its Korean Market Customers and to provide billing and IT Support to UBI at a level comparable to its preexisting Systems already in place in connection with its preexisting business in the United States." (*Id.* ¶ 22.)  For its part, "UBI would assume the responsibility for sales and marketing, and the establishment of a dealer network as it had experience in these areas." (*Id.* ¶ 23.) Moreover, "UBI would also be responsible for dealer support, customer support and billing and collections," with the understanding that KDDI America would provide billing and IT support for these functions.  (*Id.* ¶ 24.)

The parties allegedly "understood and agreed . . . that the launch of this new service . . . would require a significant expenditure of joint time, resources, and skills." (*Id.* ¶ 19.)  KDDI America and UBI would both "absorb losses" for a time, until the business arrangement became sustainable, with the understanding that KDDI America could absorb greater losses.  (*Id.* ¶¶ 20, 46-47.)  UBI could absorb losses up to $600,000, but no more, and it entered the endeavor with the expectation that KDDI America would bear losses above that amount.  (*Id.* ¶¶ 46-47.)

According to the allegations, it was "essential" for UBI to have "ownership and control over the customers," and that once the enterprise broke even, "UBI's business model would be sustainable and it would have created a valuable asset for itself."  (*Id.* ¶ 49, 48.)

KDDI Corp. factored into the KDDI America–UBI arrangement as follows.  According to UBI, while KDDI America and KDDI Corp. promised financial, billing, and IT support to UBI, KDDI Corp. was "secretly conspir[ing] with KDDI America to deprive UBI of the ownership and control of the customers in an illegal and improper manner."  (*Id.* ¶¶ 26-27.) KDDI America and KDDI Corp., in an attempt to destroy UBI and get its customers for themselves, did not live up to their end of the deal.  This imperiled UBI, which (as the defendants purportedly intended) risked losing its customer base.

**B.  <u>The Particulars of the Alleged "Agreements"</u>**

The parties are far apart on what document or documents govern their arrangement. UBI's second amended complaint alleges the factual circumstances surrounding each as follows.

On March 29, 2010, representatives from UBI and KDDI America met at UBI's New Jersey office to discuss how the business would be structured, as well as the products and service to be offered and the commission and revenue margins that would govern.  (SAC ¶ 50.)  Inho Choi of UBI and Toshiro Akiyama of KDDI America each executed a short document UBI calls the "Meeting Minutes," which purportedly set out terms that the parties "verbally agreed to at such point."  (*Id.* ¶ 51.)  Akiyama, however, crossed out "KDDI America, Inc." under his signature.  (*Id.* ¶ 52; Ex. A to SAC.)[1]  According to UBI, Akiyama "signed to confirm the general understanding of the parties but refused to acknowledge that such signature was on

---

[1] On a motion to dismiss, the Court can consider the allegations in the complaint, exhibits attached to it, matters of public record, and "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

behalf of KDDI America."  (SAC ¶ 52.)  Nonetheless, UBI asserts, this "informal document" governed the parties' business relationship from that point.  (*Id.*)

Over the next 3-4 months, UBI realized that it was losing money "at a level that was not sustainable."  (*Id.* ¶ 53.)  By late August 2010, UBI's DK Shin sought additional financial support from KDDI America.  (*Id.* ¶ 54; Ex. B to SAC.)

In December 2010, representatives of UBI and KDDI America executed a two-page agreement (in fact, a one-page document with a one-page exhibit) that bore an effective date of March 29, 2010.  (SAC ¶ 55; Ex. C to SAC.)  UBI refers to this document as the "Two Page Agreement."  The Two Page Agreement addressed each party's responsibilities, service plans to be made available, handset access, financial and payment terms, and term and termination.  (Ex. C.)  It also increased the revenue percentage to which UBI was entitled (from 10% in 2010 to 40% in 2011), which UBI contends "was in direct response to the prior discussions of the parties regarding the unsustainable losses incurred by UBI," and left the door open for KDDI America to request downward adjustment of the percentage if UBI made "an excessive profit margin." (*Id.* ¶¶ 61-63; Ex. C.)  UBI claims that the Two Page Agreement was not meant to be an integrated agreement and did not contain all essential terms of the parties' arrangement.  (SAC ¶¶ 56-58.)

Following the execution of the Two Page Agreement, the parties purportedly "acknowledged in writing on multiple occasions that they would prepare a more formal agreement to cover the [sic] all of the remaining terms of the business arrangement between the parties."  (SAC ¶ 72.)  Further, UBI contends that:

> 64.    At KDDI America's request, the parties further agreed and clarified their agreement to adjust profit by and between them that they would operate under a Combined Profit and Loss Arrangement so that if the Profits were greater than needed to ultimately get the business launched and to allow UBI to attain a critical

mass of customers so as to reach a break even point, KDDI America would retain the reasonable discretion to lower the profits of UBI.

65.   Conversely, the parties also understood and agreed that if the costs of getting the venture to the break even point were greater, KDDI America would absorb a greater percentage of the costs pursuant to the Combined Profit and Loss Business Arrangement.

(*Id.* ¶¶ 64-65.)  It appears, though UBI does not specify, that this "agreement" or "clarification" on adjusting profit and loss allocations occurred after the Two Page Agreement was executed. (*See id.* ¶ 73 ("On multiple occasions after the execution of the two page document, KDDI America acknowledged verbally that the parties were to operate their business based on a Combined Profit and Loss Arrangement.").)[2]

On July 13, 2011, Toshiro Akiyama, then a director at KDDI America, emailed UBI a draft email he planned to send to another telecommunications company, SK Telecom, with which UBI claims to have had an existing relationship [SAC ¶ 15], describing the UBI–KDDI America relationship thus:

> The relationship between UBI and KDDI is unique.  Originally, KDDI wanted to go after Korean-American Market, but we had to have good marketing team to do it.  I thought about joint venture or investing money to UBI, or employ UBI member as KDDI employee at that time.  However, due to internal rule of KDDI, I could not make it.  We are still two independent companies, but we operate just like one joint venture now.

(*Id.* ¶¶ 75-76.)

---

[2] The term "Profit and Loss Arrangement" (also called a "Profit and Loss Rule") is left undefined in the complaint.  At oral argument counsel for UBI indicated that the term referred to a verbal arrangement or agreement, and pointed to the diagram attached as Exhibit H to the complaint.  It appears that UBI has used this term to explain the concept that the amount of money to which KDDI America would be entitled would increase if the costs were lower than expected, and that the amount it would "absorb" with respect to losses would be greater if the costs were higher than expected.  (*See* SAC ¶¶ 64-65.)

6

In December 2011, KDDI America sent a document to UBI for its signature that UBI calls the Audit Agreement, which was "backdated" to April 1, 2010.  (SAC ¶ 77.)  UBI alleges that the Audit Agreement conflicts with the parties' course of dealing both before and after KDDI America sent it.  (*Id.* ¶ 78.)  Nonetheless, because KDDI America assured UBI that the document was for purposes of an audit only, UBI signed and returned it.  (*Id.* ¶ 79.)  In so doing, Inho Choi of UBI also stated that "[t]o avoid confusion, [he] will update the actual agreements and understandings separately based on current business condition and will send it to you."  (*Id.*)  Akiyama, of KDDI America, acknowledged receipt of the email.  (*Id.* ¶ 80.)  UBI contends that the Audit Agreement "was never actually consummated between the parties and was not intended to bind them," pointing out that "it was never countersigned by KDDI America or returned to UBI."  (*Id.* ¶ 81.)  UBI states that the parties never operated their business pursuant to the Audit Agreement.  (*Id.* ¶ 82.)

### C. <u>Breakdown of the Relationship</u>

According to UBI, problems arose early on.  KDDI America was to begin supplying the HTC Hero phone to UBI for resale in June 2010.  (SAC ¶ 87.)  It was important for phones to be supplied in a timely manner because the parties wanted to retain UBI's preexisting Helio customers, rather than starting from scratch.  (*Id.* ¶¶ 84-86.)  In furtherance of this goal and relying on KDDI America's promise to provide the supply, UBI offered the phones to these customers as incentives to switch from Helio to KDDI America service.  (*Id.* ¶ 88.)  When KDDI America failed to supply the phones as promised, UBI lost "a significant amount of customers."  (*Id.* ¶ 89.)  From UBI's second amended complaint it appears that at some point KDDI America did provide phones for UBI to sell [*see id.* ¶ 106], but the precise timing is unclear.  At the very

least, UBI contends that KDDI America did not provide the phones in a sufficiently expeditious manner.

KDDI America also promised that it would upgrade UBI's billing system to one comparable in quality to the system in place for KDDI America's Japanese customers. (SAC ¶¶ 90-91.) KDDI America and KDDI Corp. also were to automate various billing and payment functions. (*Id.* ¶¶ 98-100.) UBI had been using an unsophisticated system that involved hand-stuffed envelopes, unperforated payment slips, and various content problems, such as incorrect and missing data. (*Id.* at ¶¶ 90-93.) Even after Akiyama of KDDI America[3] and Toshio Maki of KDDI Corp. promised to upgrade UBI's billing capabilities, and even after the companies "acknowledged that KDDI America had not met its obligations," the improved system was never implemented, leading to increased costs, lost customers, and a damaged reputation for UBI. (*Id.* ¶¶ 94-97, 100.) Moreover, UBI contends that "at the time that UBI and KDDI America entered into the business relationship between the parties and at the time the aforesaid promises and representations were made by KDDI America and KDDI Corp. to UBI, neither KDDI America nor KDDI Corp. ever intended to provide the promised IT and Billing support." (*Id.* ¶ 101.)

UBI posits that the defendants' failings with respect to the billing system should be viewed through the lens of their other actions, which show that they were intent on harming UBI and ultimately stealing its customers. UBI gives specifics about this as follows. In May 2012, KDDI America announced that it would not permit UBI to match other retailers' prices for the phones it was supplying to UBI for resale, and required UBI to sell its handsets at double the price of the same phones offered by Sprint and Best Buy. (SAC ¶¶ 106-08.) Consequently, UBI sold far fewer phones from May to July 2012 and lost $136,500 in activation commissions

---

[3] According to the complaint, Akiyama later became a "senior official" with KDDI Corp. (*See* SAC ¶¶ 330, 396; *see also id.* ¶ 96.)

during that time alone.  (*Id.* ¶ 111.)  UBI asserts that KDDI America intended this to happen. (*Id.* ¶ 109.)

UBI alleges KDDI America also took the position that between May 2012 and July 26, 2012 (the date on which Toshio Maki of KDDI Corp. and Daichi Nozaki of KDDI America met with UBI), UBI had failed to timely pay certain balances it owed to KDDI America for phones supplied.  As a result, KDDI America said it would not upgrade the billing system or provide the promised IT support until UBI made the payments, and it threatened not to ship phones to UBI. (*Id.* ¶ 112.)  UBI contends under their agreement UBI was required to make only "net" payments – what it owed to KDDI America, less amounts due from KDDI America – and that under this arrangement, UBI did not in fact owe anything to KDDI America (which had begun insisting upon payment within 90 days without any offset).  (*Id.* ¶¶ 113-15.) UBI states that ultimately KDDI America acknowledged its calculation error.   (*Id.* ¶ 116.)

However, the payment issue persisted, and as the next step in its alleged customer-stealing "quest" against UBI, KDDI America ("in concert with" KDDI Corp. and "at [its] direction") changed the payment terms on its invoices, so that UBI had to pay up within 60 days – meaning that "UBI actually owed a large net overdue balance to KDDI America."  (SAC ¶¶ 117.)[4]  UBI claims that this change was intended as an excuse for KDDI America to withhold

---

[4] The timeline of events in UBI's complaint is occasionally inconsistent.  An exhibit to the complaint suggests that the 90-day to 60-day "change" in payment terms may have arisen in late August 2012; *i.e.*, after several meetings between the parties' representatives had taken place. (*See* Ex. J to SAC, Emails between D. Shin, UBI, and D. Nozaki, KDDI America (Aug. 24-27, 2012).)  Another exhibit suggests that this may not have been a change at all – that the 60-day schedule was agreed to by the parties.  (*See* Ex. C to SAC, Two Page Agreement at Exhibit A (setting "[h]andset purchase payment term" at 90 days from invoice date for two phone models and 60 days for all others).)  In any event, it appears that the payment term issue arose during summer 2012, when the problems between the parties intensified and the series of meetings described in this section was held.

phones. (*Id.*) An email provided as an exhibit to the complaint suggests that KDDI America viewed the 60-day term as required under the parties' contract (which it did not describe with any specificity) and accounting rules, but that KDDI did not necessarily "blame" UBI for operating on a 90-day schedule "since it was allowed at operational level." (Ex. J to SAC, Email from D. Nozaki, KDDI America, to D. Shin, UBI (Aug. 27, 2012).)

Around the same time frame of July to August 2012, KDDI Corp.'s Toshio Maki called for a meeting at UBI's New Jersey offices, to address "performance related issues and marketing and sales strategy, as well as the Accounts Receivable and Payable Issues that KDDI America had raised." (SAC ¶¶ 118-19.) In reality, UBI alleges that the meeting was just part of the defendants' improper "attempt to wrest control over UBI's customers from UBI." (*Id.* ¶ 121.) At the meeting, held on July 26, 2012, Maki of KDDI Corp. and Daichi Nozaki of KDDI America said that they wanted to take over UBI's billing, purportedly to reduce UBI's expenses. (*Id.* ¶¶ 123, 121.) However, the KDDI representatives also indicated that KDDI America would be billing in *its* name – "thereby essentially taking over the customers of UBI and cutting UBI out of the business." (*Id.* ¶ 122.) UBI contends that shortly afterwards, KDDI America "cut off the supply of handsets to UBI," leading to "a significant additional loss of commissions and revenue." (*Id.* ¶¶ 125-26; Ex. E.)

On August 10, 2012, another meeting was held, this time at the Fort Lee office of a KDDI America affiliate. (SAC ¶ 127.) Representatives from KDDI America and UBI, but not KDDI Corp., were present. (*Id.*) KDDI America's Daichi Nozaki "reiterated that KDDI America wanted to take over the billing of UBI as soon as was possible to help reduce UBI's operational costs," and "stated that it would be relatively easy for KDDI America to take over the billing of UBI and thus implement the promised improvements from a Billing and IT

standpoint." (*Id.* ¶¶ 127-28.)  UBI questioned why, if it were easy, it hadn't been done earlier as promised, and why KDDI America was only stepping in on the condition that it directly bill customers (and therefore gain control over them).  (*Id.* ¶¶ 129-31.)

Around the time of these meetings,[5] UBI tried to find out whether the defendants "no longer wished to abide by their previous business rules and agreement of Combined Profit and Loss Statement and working as a team." (SAC ¶ 133.)  The response from KDDI America was that "working as a team and sharing in the Profit and Losses was only a business philosophy and concept and that KDDI America was insisting on enforcement of the fraudulently obtained Audit Agreement." (*Id.* ¶ 134.)

Allegedly unsatisfied with UBI's "resistance" to the defendants' attempts to gain control of the customer base, Toshio Maki of KDDI Corp. called for another meeting.  (SAC ¶ 135.)  On September 27, 2012, the parties met in UBI's New Jersey offices.  (*Id.*)  Maki apologized to UBI's representatives for problems with the billing system and IT support "and admitted that the [d]efendants did not fulfill their promises to UBI." (*Id.* ¶ 136.)  But Maki also suggested that KDDI America had, in UBI's phrasing, "made up for such poor performance" by increasing the revenue percentage to which UBI was entitled from 10% in 2010 to 40% in 2011, and again expressed that KDDI "was to take over UBI's customers by taking control of its billing." (*Id.* ¶¶ 137-38.)  UBI also alleges that at the very same meeting, Maki reaffirmed that the defendants would continue providing UBI with financial support "as long as UBI had a strong will to achieve a Break Even Point within a certain period of time." (*Id.* ¶ 139.)  The latter sentiment was reiterated on October 5, 2012 in another meeting with UBI in New Jersey, this time by Toshiro Akiyama – formerly with KDDI America but by that time the "Manager of Marketing

---

[5] UBI does not specify a date for this exchange, but it appears from Exhibit G to the complaint that the issue may have arisen in the July 26, 2012 meeting.

Strategy" for KDDI Corp. (*Id.* ¶¶ 140-41.) Akiyama told UBI that KDDI Corp. (the parent) "would give additional incentives [and] financial support to UBI." (*Id.* ¶ 141.) UBI contends that a diagram Akiyama prepared at that meeting "confirms the fact that at such meeting KDDI Corporation verbally promised and reaffirmed the prior commitment of KDDI America and KDDI Corporation to provide financial support to UBI until UBI reached a break even point." (*Id.*)

Notwithstanding these promises, and KDDI America's representation to UBI that it would proceed with the business relationship (while preserving the parties' rights to bring claims for previous breaches), KDDI America withheld certain commissions, telling UBI that it was offsetting them against amounts UBI owed it. (SAC ¶¶ 142-44.) It "refused to admit" that KDDI Corp. "had agreed to provide additional financial support," and "without justification" increased by $60 the price of each phone UBI was buying from it. (*Id.* ¶¶ 145-46.) Both KDDI America and KDDI Corp. also continued to renege on promises to provide IT support. (*Id.* ¶ 147.) UBI alleges that KDDI Corp. directed KDDI America to withhold phones, and IT and billing and financial support unless UBI ceded control of the customer base. (*See, e.g.*, *id.* ¶ 331.)

### D.  Procedural History

On February 13, 2013, UBI filed an eight-count complaint against KDDI America and KDDI Corp. in New Jersey state court. (D.E. 1-1.) UBI asserted claims of breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty against KDDI America; legal fraud and equitable fraud against KDDI America and KDDI Corp.; and intentional and negligent interference with contractual relations against KDDI Corp. (*See id.*)

On March 15, 2013, KDDI America filed a seven-count complaint against UBI in this Court.  (*See* Civ. Action No. 13-1642, D.E. 1 (hereafter, "Parallel Action").)  KDDI America claimed that it had not been paid for mobile network services and handsets it supplied to UBI, and that it filed the action "to collect the past due amount" of $2.2 million, plus late charges and attorneys' fees.  (*Id.* ¶ 1.)  KDDI America's complaint made contentions about the parties' early interactions and the circumstances surrounding the eventual execution in December 2011 of what UBI calls the Audit Agreement (and KDDI America calls the Formal Agreement).  (*See, e.g.*, *id.* ¶¶ 16-20 (discussing early drafts exchanged in April 2010 of Audit Agreement), ¶¶ 33-41 (discussing execution and terms of Audit Agreement).)  KDDI America also contends that after it ordered a number of Samsung Heat phones in reliance on UBI's representation that it would purchase them for resale, UBI ended up buying only a fraction of that amount and KDDI America lost money as a result.  (*Id.* ¶¶ 22-26.)  KDDI America's complaint against UBI includes claims for breach of the Formal Agreement (count 1), breach of the agreement to purchase the Samsung Heat phones (count 2), "book account" (count 3), breach of contract under UCC § 2-709 (count 4), breach of the "Short Form Agreement" (what UBI calls the Two Page Agreement) (count 5), unjust enrichment (count 6), and quantum meruit (count 7). While KDDI America seeks different amounts on various counts, it seeks damages in excess of $2.2 million.

After filing its own complaint, KDDI America filed a notice of removal of UBI's action on the same day, asserting diversity jurisdiction.  (D.E. 1.)  KDDI Corp. indicated its consent to removal in the notice of removal, but did not join in it, and did not concede that service upon it was proper.  (D.E. 1, ¶ 19.)  KDDI Corp. also stated that it reserved the right to assert "any defense or affirmative matter," including lack of personal jurisdiction.  (D.E. 1, ¶ 19.)

On April 5, 2013, KDDI America and KDDI Corp. each moved to dismiss UBI's complaint, KDDI America for failure to state a claim and failure to plead fraud with particularity, and KDDI Corp. for lack of personal jurisdiction or, in the alternative, failure to state a claim.  (D.E. 10, 11.)  Also on April 5, 2013, KDDI America moved to consolidate the Parallel Action it filed with the action initiated by UBI.  (Parallel Action, D.E. 6.)  Having obtained an earlier-filed docket number for its action in this Court by filing its complaint before filing its notice of removal of UBI's action, KDDI America sought to consolidate UBI's action into its own.  (Parallel Action, D.E. 6.)  The Court granted the motion to consolidate on April 23, 2013, but consolidated the actions under UBI's lawsuit as the first-filed action.  (D.E. 13; Parallel Action, D.E. 9.)

On April 22, 2013, UBI filed an amended complaint of right [D.E. 15], and on May 9, 2013, UBI answered KDDI America's complaint.  (D.E. 22.)  KDDI America and KDDI Corp. withdrew their motions to dismiss and re-filed them on May 20, 2013, directed to UBI's amended complaint.  (D.E. 24, 25, 26.)

On September 3, 2013, KDDI America filed an emergency motion seeking an order to show cause why a lien and writ of prejudgment attachment against the assets of UBI in New Jersey should not issue.  (D.E. 33.)  In its papers, KDDI America contended that UBI was planning to sell or transfer its assets to a "shell" company, where they would be beyond KDDI America's reach in the event of a judgment in its favor on the debt it claims UBI owes it and which forms the basis of its claims in this consolidated action.  The Court denied relief on September 5, 2013, but permitted KDDI America to apply to Magistrate Judge Waldor for expedited targeted discovery about the purported shell company associated with UBI.  (D.E. 34.)

On October 22, 2013, UBI filed a motion for leave to file a second amended complaint adding a claim against KDDI America under the UCC and a counterpart New Jersey statute regarding KDDI America's purported failure or refusal to provide the required supply of phones. (D.E. 38.)  Magistrate Judge Waldor granted the motion to amend, which was unopposed, on November 4, 2013, and set an expedited briefing schedule for re-filing motions to dismiss directed to the second amended complaint.  (D.E. 43.)

UBI filed its second amended complaint on November 6, 2013.  (D.E. 44.)  It asserts claims against KDDI America for breach of contract (count 1); promissory estoppel (count 2); breach of the covenant of good faith and fair dealing (count 3); breach of fiduciary duty of joint venturer (count 4); breach of fiduciary duty of partner (count 5); fraud (count 6); equitable fraud (count 7); and for damages under UCC § 2-715 and N.J.S.A. 12A:2-715 (count 12).  UBI also asserts claims against KDDI Corp. for aiding and abetting breach of fiduciary duty of joint venturer (count 8); aiding and abetting breach of fiduciary duty of partner (count 9); aiding and abetting fraud (count 10); and intentional interference with contract and prospective economic relations (count 11).

KDDI America and KDDI Corp. re-filed their motions to dismiss, directed to the second amended complaint.  (D.E. 46, 47.)  Oral argument was held on January 14, 2014. (D.E. 59.)

## III.   __Choice of Law__

This action is before the Court on the basis of diversity jurisdiction.  "A federal court sitting in diversity must apply state substantive law and federal procedural law."  *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262 (3d Cir. 2011) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).  To determine which state's substantive law applies, the forum state's choice of law rules control.  *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir.

2013).  New Jersey uses the "most significant relationship" test of the Restatement (Second) of Conflict of Laws for tort claims.  *Id.* (citing *P.V. v. Camp Jaycee*, 197 N.J. 132 (2008)).  The test looks first at whether there is an "actual conflict" between the states' laws at issue; if so, the second step involves assessing "which jurisdiction has the 'most significant relationship' to the claim," a multi-factored inquiry.  *Id.* at 206-07.  "[I]f a choice-of-law determination is necessary, it is made on an issue-by-issue basis." *Cornett v. Johnson & Johnson*, 211 N.J. 362, 374 (2012).

When the parties agree upon which state's law applies, however, the Court need not conduct this choice-of-law inquiry.  *TekDoc Servs., LLC v. 3i-Infotech Inc.*, No. 09-6573, 2013 WL 2182565, at *10 & nn.11-12 (D.N.J. May 20, 2013) (Cooper, J.); *see also MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 737 & n. 5 (E.D. Pa. 2013) (Brody, J.); *Sager v. Hoffman-La Roche, Inc.*, 2012 WL 3166630, at *14 n.9 (N.J. Sup. Ct., App. Div. Aug. 7, 2012) (per curiam) ("Because the parties agree that Florida substantive law applies here, we need not engage in the choice of law analysis otherwise called for by [*Camp Jaycee*], examining which State has the most significant relationship to each case.").

Here, the parties rely on New Jersey law in their briefs.  KDDI America assumes the application of New Jersey law for the purposes of its motion while "expressly reserv[ing] the right to argue otherwise in the future based upon the terms of the Formal Contract [Audit Agreement], which expressly provides that Kansas law governs."  (KDDI-A Mot. Br. 5.)  KDDI Corp.'s and UBI's briefing invokes New Jersey law without comment.  As the parties have consented to the application of New Jersey law for the resolution of the pending motions, the Court applies it.

## IV.   KDDI America's Motion to Dismiss

KDDI America moves to dismiss counts four, five, six, and seven of the Amended Complaint for failure to state a claim for which relief may be granted.  It argues, in substance, that UBI is trying to expand what is really a straightforward breach of contract action into a "complex, tort-ridden" dispute.

## A.  Standard of Review under Fed. R. Civ. P. 12(b)(6)

The Federal Rules require complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive dismissal under R. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The analysis requires separating factual allegations from legal conclusions; disregarding the latter; and examining whether "'the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).  A claim satisfies the "plausibility" standard only if the factual material presented permits the Court to "'draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).  The plaintiff need not establish all of the elements for a *prima facie* case at the motion-to-dismiss stage, but "need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  *Fowler*, 578 F.3d at 213 (citation omitted).

## B.  Count Four (Breach of Fiduciary Duty of Joint Venturer) and Count Five (Breach of Fiduciary Duty of Partner)

KDDI America moves to dismiss count 4, breach of fiduciary duty of joint venturer, and count 5, breach of fiduciary duty of partner, on the grounds that KDDI America and UBI formed neither a joint venture nor a partnership, and that KDDI America therefore owed UBI no

fiduciary duty.  As an initial matter, the Court notes that UBI's own theory of the case – that KDDI America had a plan to steal UBI's customers and took steps to put that plan into action – actually supports KDDI America's position in this respect: these companies were not joint venturers or partners, but separate business entities engaged in an arms-length business transaction.

Claims for breach of fiduciary duty require the existence of a fiduciary duty or relationship between the parties, breach of that duty, and resulting damages.  *See F.G. v. MacDonnell*, 150 N.J. 550, 563-64 (1997).   With respect to the first element, "[t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position.  A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  *F.G.*, 150 N.J. at 563 (citing Restatement (Second) of Torts § 874 cmt. a (1979)).  UBI asserts that such a relationship between it and KDDI America exists in the form of a joint venture or a partnership. Joint venturers and partners, respectively, do as a general matter owe fiduciary duties to one another.  *See Silverstein v. Last*, 156 N.J. Super. 145, 152 (App. Div. 1978).  The issue is whether the arrangement between UBI and KDDI America rose to this level, accepting as true for present purposes that the arrangement was as UBI has pleaded it in the second amended complaint.

With respect to the "joint venture" relationship alleged in connection with count four, New Jersey defines a joint venture as:

> '[a] special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation.' *Wittner v. Metzger*, 72 N.J. Super. 438, 444 (App. Div.) (quoting *Kurth v. Maier*, 133 N.J. Eq. 388, 391 (E. & A. 1943)), *certif. denied*, 37 N.J. 228 (1962). It is 'an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.' *Ibid.* For a joint venture to have been

> formed, the parties must have agreed upon the essential terms. A joint venture agreement does not exist if the terms are 'so vague, indefinite and uncertain as to make it illusory and therefore unenforceable.' *Paley v. Barton Sav. & Loan Ass'n*, 82 N.J. Super. 75, 82 (App. Div.), *certif. denied*, 41 N.J. 602 (1964). In determining whether a joint venture was formed, the court's primary consideration is the intention of the parties. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992).

*Burnham v. WMC Mortg. Corp.*, No. 07-6101, 2010 WL 2560657, at *7 (D.N.J. June 21, 2010) (Simandle, J.) (alteration in original) (quoting *Ginsberg v. Bistricer*, No. A-5751-03T5, 2007 WL 987169, at *11 (App. Div. Apr. 4, 2007)).  Further, "[a] joint venture generally requires 'some or all of the following elements:

> (A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;
>
> (B) A joint property interest in the subject matter of the venture;
>
> (C) A right of mutual control or management of the enterprise;
>
> (D) Expectation of profit, or the presence of 'adventure,' as it is sometimes called;
>
> (E) A right to participate in the profits;
>
> (F) Most usually, limitation of the objective to a single undertaking or ad hoc enterprise."

*Id.* at *7 (quoting *Wittner*, 72 N.J. Super. at 444).

With respect to count 5, alleging a breach of fiduciary duty premised on the existence of a partnership, under New Jersey law, partnerships and joint ventures are similar and present the same elements.  *Carney v. Hansell*, 363 N.J. Super. 111, 121 (Ch. Div. 2003) ("The elements required to establish a joint venture are essentially the same as that for a partnership.").  Under New Jersey's Uniform Partnership Act, a partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit formed under section 10 [C.42:1A-10] of this act, predecessor law, or comparable law of another jurisdiction."  N.J.S.A. 42:1A-2.

Under N.J.S.A. 42:1A-10(c), one "who receives a share of the profits of a business is presumed to be a partner in the business," although there are exceptions.

"[O]ther 'elements to be considered  include the intention of the parties, obligation to share in losses, ownership and control of partnership property and business, community of power and administration, language used in the partnership agreement, conduct of the parties toward third persons, and rights of the parties upon dissolution.'" *Eagan v. Gory*, 374 F. App'x 335, 338-39 (3d Cir. 2010) (non-precedential) (quoting *Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F. Supp. 635, 646-647 (D.N.J. 1990) (citing *Fenwick v. Unemployment Comp. Comm'n*, 133 N.J.L. 295 (E & A 1945)). *See also Estate of Spencer v. Gavin*, 400 N.J. Super. 220, 249-50 (App. Div. 2008) (citations omitted) (discussing "requisite elements" for *de facto* partnership as including "joint control over a common business" and a "'community of interest in the profits or losses'"); *Nadel v. Starkman*, No. A-4204-08T1, 2010 WL 4103626, at *10 (App. Div. Oct. 20, 2010) (quoting *Kozlowski v. Kozlowski*, 164 N.J. Super. 162, 171 (Ch. Div. 1978), *aff'd*, 80 N.J. 378 (1979)) ("Other indicia of partnership 'include agreement, sharing profits and losses, ownership and control of the partnership's property and business, community of power, rights upon dissolution and the conduct of the parties towards third persons, among others.'").

A careful assessment of UBI's factual allegations about its relationship with KDDI America reveals that UBI has not sufficiently pleaded the existence of a joint venture or partnership.  As to the element of a common undertaking or business which is at the heart of such relationships, UBI characterizes its arrangement with KDDI America as "a special relationship whereby [the parties] were to jointly launch a mobile telephone service for Korean customers in the United States," and asserts that the undertaking or business was building the

service for the group of customers it targeted.  (SAC ¶¶ 6, 199, 200.)  It paints its contribution to the endeavor as the customer base, along with its experience in marketing to those customers. (*See id.* ¶¶ 7-8, 16, 18, 23-24.)  However, UBI also asserts that the end goal was to create a valuable asset for *itself*.  (*See, e.g.*, SAC ¶ 48 (asserting that "at all relevant times, it was understood and agreed by all of the parties, that once the venture reached a critical mass of mobile customers and attained a break even point, UBI's business model would be sustainable and it would have created a valuable asset for itself"); *id.* ¶ 18 ("UBI had Korean customers, knowledge of the Korean marketplace and a desire to build a large and valuable mobile customer base that would create a long term revenue[/]profit stream for it.").)  Further, UBI alleges that it was "essential" for it to have "ownership and control over the customers." (*Id.* ¶ 49.) This proprietary stance over the customer base implies neither a partnership nor a joint venture.

Further, in describing KDDI America's "primary responsibilities" in the alleged venture or partnership, UBI contends that KDDI was to "provide financial support *to UBI*," "provide air time at competitive rates for *UBI's* existing and future Korean market customers," "procure and supply handsets *to UBI* for resale to its Korean Market Customers," and "provide billing and IT Support *to UBI*."  (SAC ¶ 22 (emphasis added).)  This too undermines an inference that the parties contemplated a common undertaking or that they held a joint property interest in the business UBI alleges was to be launched.[6]

The lack of a joint property interest is also apparent in UBI's allegations regarding payment terms between it and KDDI America for the purchase of handsets.  UBI's complaints about KDDI America's attempts to reduce the turnaround time for UBI's payments to it for

---

[6] At oral argument, counsel for UBI suggested that the revenue stream was the asset that the parties agreed to share.  Even were the Court to consider the revenue stream a joint property interest, it would not rise to the level of a fiduciary relationship given the arrangement's other characteristics.

handsets KDDI America sold it suggest the absence of joint bank accounts or other financial arrangements, and instead, describe the existence of two separate companies operating at arms-length. (*See* SAC ¶¶ 112-17.)

With respect to the parties' intentions and to how they held out the arrangement to third parties, UBI claims that "KDDI America described the relationship between the parties as a joint venture agreement." (SAC ¶ 74.) However, in support, UBI points to a statement by a KDDI executive that in effect says that KDDI considered a joint venture, but was prevented from pursuing that avenue due to company rules. As described earlier, on July 13, 2011, Toshiro Akiyama, then a director at KDDI America (and apparently later an executive at KDDI Corp.), emailed UBI a draft email he planned to send to another telecommunications company describing the UBI-KDDI America relationship thus:

> The relationship between UBI and KDDI is unique. Originally, KDDI wanted to go after Korean-American Market, but we had to have good marketing team to do it. I thought about joint venture or investing money to UBI, or employ UBI member as KDDI employee at that time. However, due to internal rule of KDDI, I could not make it. We are still two independent companies, but we operate just like one joint venture now.

(*Id.* ¶¶ 75-76.) Even assuming this statement was ultimately made outside of a draft email sent only to UBI [s*ee id.* ¶ 75], it is not the admission UBI makes it out to be. Though Akiyama uses "joint-venture" terminology, labels are not determinative, and the statement as a whole expresses the position that KDDI rules do not allow for joint ventures. The statement is at best neutral as to whether a joint venture or partnership existed or was intended. Furthermore, UBI's contention that its own "reputation and brand in the marketplace" were damaged as a result of KDDI America's alleged shortcomings [*see, e.g.*, SAC ¶ 100] are indication that the parties held themselves out to third persons as separate entities. (*See also* Ex. A to SAC (UBI was to be "[r]eseller with own brand").)

UBI's factual allegations surrounding the supply of the handsets from KDDI America to UBI also indicate that the parties' intention was not creation of a fiduciary relationship. UBI alleges that the arrangement for the supply of handsets – the lifeblood of the business, as they were the means by which customers would be retained and/or added – was such that KDDI America would be selling UBI handsets for resale and would determine the resale price for those handsets, and that UBI's ability to resell them depended on the resale price being competitive in the market. (SAC ¶¶ 202-05, 230-33; *see also* Ex. A to SAC.) This is not indicative of an asset that KDDI America intended to contribute to a joint endeavor; it describes an arrangement whereby a supplier of goods sells them to another party that in turn will resell them. That KDDI America had a stake in the outcome of the reselling insofar as it was entitled to a portion of the resulting revenue does not change the character of its supply arrangement.

Indeed, that KDDI America and UBI were to split revenue is itself further indication that their arrangement was not a joint venture or a partnership. Although UBI occasionally uses the term "profit" and refers to an undefined "Combined Profit and Loss Arrangement," in alleging the mechanics of the relationship it cites and relies on documents describing revenue sharing. (*See* SAC ¶¶ 51-52, 55; Exs. A & C to SAC.) It further states that parties agreed to a change in the allocation of revenues as between them because the initial split had UBI losing money at an unsustainable rate. (SAC ¶¶ 61-62.) As KDDI America points out in its brief, by sharing revenue rather than profit the parties were bearing their own expenses. (KDDI-A Mot. Br. 9.) UBI's conclusory statement that "[a]t all relevant times, it was understood by the parties that each party had an expectation of profit and a right to participate in profit" [SAC ¶¶ 208, 236] is insufficient to overcome the more specific statements made throughout the complaint and in the documents attached to it.

UBI has also not sufficiently alleged the existence of mutual control or management, or power and administration, over the mobile phone service.  Instead it states in conclusory fashion that "[a]t all relevant times, it was understood by the parties that each party had a say in important decisions of the management of the venture."  (SAC ¶¶ 209, 237.)  The complaint fails to specify what these important decisions were, and points only to UBI's "send[ing] of budgets to KDDI America on multiple occasions for its review and input."  (*Id.* ¶¶ 210, 238.)  Further, the allegations about how the arrangement was to work are inconsistent with an inference that the parties contemplated or exercised mutual control.  KDDI America was to supply handsets and access to a mobile network; it set UBI's resale price for the handsets and the rates for use of that network, though there is some indication that KDDI America would amend the plans it offered "according to UBI Telecom's request upon mutual agreement."  (SAC ¶¶ 12, 67.)  KDDI had infrastructure UBI wanted to use for billing purposes, and had control over its implementation.  (*Id.* ¶ 11, 22, 91, 93.)  KDDI determined the level of financial support it would provide, and reserved to itself the right to seek a higher revenue margin if UBI was making more than it needed to make the service sustainable.  (*Id.* ¶¶ 22, 45, 62-65.)  UBI, on the other hand, wanted its own "ownership and control" over the customers.  (*Id.* ¶ 49.)

As to the sharing of losses, this factor could support the existence of a joint venture or partnership to an extent, as UBI has pleaded that it would sustain a particular level of losses, and when that point was reached KDDI America would bear them thereafter.  However, the "financial support" to be provided is presented as a means of helping the business to reach a "break-even" or "sustainable" point – not as an agreement to share losses indefinitely.  (*See* SAC ¶¶ 20, 45-46, 48, 64-65, 139-41.)

UBI's allegations describe an arms-length business relationship, not a fiduciary one.  As UBI describes, two separate businesses are involved, one supplying items and services the other needed to run its operation, in exchange for remuneration via the revenue generated by that operation.  This is not the type of relationship that gives rise to a claim for breach of fiduciary duty.  *See, e.g.*, *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 552-53 (App. Div. 1997); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 32-33 (S.D.N.Y. 1999).  The relationship UBI has depicted is a commercial one, not one in which "one party place[d] trust and confidence in another who is in a dominant or superior position," with the latter having "a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  *F.G.*, 150 N.J. at 563. *See also Silverstein*, 156 N.J. Super. at 153 (reversing dismissal of action for breach of fiduciary duty where trial court applied commercial standard of conduct rather than fiduciary standard to evaluate joint venturer's alleged conduct).

Accordingly, as UBI has not sufficiently pleaded the existence of a fiduciary relationship between it and KDDI America, it has not made out a claim for breach of fiduciary duty, and its claims in counts four and five will be dismissed.[7]

### C.  Count Six (Fraud) and Count 7 (Equitable Fraud)

KDDI America argues that UBI's fraud claims against it are redundant of UBI's breach of contract claim, and a fraud claim is not cognizable where it is based on the same factual allegations that underlie a breach of contract claim along with an assertion that the defendant never intended to perform its contractual obligations.  (KDDI-A Mot. Br. 13-15.)  KDDI America further argues that the equitable fraud claim should be dismissed because UBI has not

---

[7] The Court declines to reach the argument KDDI America's counsel made at oral argument (but not in its briefing on these counts) that, as with its position on the fraud claims, the breach of fiduciary duty claims should be dismissed because the facts alleged in support of them are the same allegations underlying UBI's breach of contract claim.

specified the reformation it seeks as a remedy.  (*Id.* at 15-17.)   UBI counters that it has adequately pleaded its fraud claim as required under Fed. R. Civ. P. 9(b), and that the fraud it alleges "was and is separate from the contract breaches."  (UBI Opp. Br. 17-20.)   UBI also argues that "KDDI America's fraudulent performance of the Agreement between the parties by attempting to rely on the fraudulently obtained Audit Agreement serves as an independent basis to sustain a cause of action for fraud."  (*Id.* at 20.) With respect to its equitable fraud claim, UBI argues that it need not specify in its complaint the specifics of the reformation it seeks.  (*Id.* at 20-21.)

The elements of a fraud claim in New Jersey are "'(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'"  *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 28 (App. Div. 2012) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)).

It appears UBI's claim in count six is one for fraudulent inducement. In count six UBI is alleging that KDDI America induced it to enter into an agreement by making promises KDDI America did not intend to keep.  Count six alleges in particular that KDDI America never intended to "abide by its representations that it would allow UBI to retain ownership and control over the customer base of mobile customers who had been and were in the future to be transferred to the KDDI Network" or to provide the billing and support functions it represented it would.  (SAC ¶¶ 261-62.)

KDDI America challenges this claim on the ground that it is a "dressed up" version of the breach of contract claim.   Contrary to KDDI America's argument, however, claims for fraudulent inducement can be predicated on the promisor having no intention of fulfilling a

promise at the time it makes that promise.  *See, e.g.*, *Tangible Value, LLC v. Town Sports Int'l Holdings, Inc.*, No. 10-1453, 2011 WL 773218, at *7 (D.N.J. Feb. 28, 2011) (Pisano, J.) (quoting *Luscko v. S. Container Corp.*, 408 F. App'x 631, 634 (3d Cir. 2010)) (noting that although "fraudulent inducement cannot be predicated upon representations which involve things to be done in the future,'" "'where a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud'"); *see also G & F Graphic Servs., Inc. v. Graphic Innovators*, Inc., No. 13-6482, 2014 WL 1818235, at *6-8 (D.N.J. May 8, 2014) (Irenas, J.) (permitting fraud claim to proceed under fraudulent inducement theory); *Metex Mfg. Corp. v. Manson*, No. 05-2948, 2008 WL 877870, at *4 (D.N.J. Mar. 28, 2008) (Ackerman, J.) (noting that "New Jersey law permits a tort claim to proceed with a breach of contract claim when the tort claim involves fraudulent inducement on the theory that such a claim is extraneous to the performance of the related contract").[8]

"Intention may be derived from circumstantial evidence such as . . . implausibility of the statement in light of subsequent acts and events . . . or evidence showing at the time of the promise that the promisor could not or would not fulfill the promise." *Luscko*, 408 F. App'x at 634-35 (citing *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J. Super. 369, 380 (App. Div. 1960)).  Nonperformance alone is, however, not sufficient to show an intent not to perform the promise. *Id.* While courts have indeed recognized fraudulent inducement claims as distinct from

---

[8] The authority KDDI America cites is not to the contrary.  *Telecom International America, Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001), relied on New York law in making the statement quoted in KDDI America's brief.  (KDDI-A Mot. Br. 14.)  *Foodtown v. Sigma Marketing Systems, Inc.*, 518 F. Supp. 485, 489-90 (D.N.J. 1980), and *Custom Communications Engineering, Inc. v. E.F. Johnson Co.*, 269 N.J. Super. 531, 541 (App. Div. 1993), both recognized a distinction between, on one hand, fraud claims based on allegations supporting a breach of contract claim, and on the other, fraudulent inducement claims.

contract claims, this area of the law is not entirely settled, and it is only when the alleged pre-contractual misrepresentation is "extraneous" or "extrinsic" to the contract that the fraud-based claim can properly proceed.  *See Montclair State Univ. v. Oracle USA, Inc.*, No. 11-2867, 2012 WL 3647427, at *4-6 (D.N.J. Aug. 23, 2012) (Wolfson, J.).

KDDI America does not argue that UBI's fraud claim is insufficiently pleaded, only that it cannot as a matter of law co-exist with UBI's breach of contract claim.  As the foregoing discussion demonstrates, this is an overly broad assertion, and is not grounds for dismissal where, as here, a fraudulent inducement theory is invoked.  This is especially so given the fine distinctions this area of law requires courts to draw when determining what alleged conduct falls within the scope of a contract at issue and what conduct does not.  While there is overlap between the allegations pleaded in support of UBI's breach of contract and fraud claims, particularly as to the allegations UBI makes in support of the knowledge element of its fraudulent inducement claim, the Court cannot at this stage conclude as a matter of law that UBI is unable to prove a fraud claim on a fraudulent inducement theory.  Therefore, the Court will permit the claim to proceed.[9]

The equitable fraud claim in count seven will also be permitted to proceed.  Under New Jersey law, the elements for a claim of equitable fraud are the same as for legal fraud claims except that scienter – "knowledge of the falsity and an intention to obtain an undue advantage therefrom" – is not required.  *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624-25 (1981).  Therefore, the elements of the claim are (1) a material misrepresentation of a presently existing fact or a past fact, (2) intent for the other party to rely on that misrepresentation, (3) the party in

---

[9] UBI introduces in its briefing, but does not clearly articulate, a fraudulent performance theory, which in any event would appear to wholly duplicate the factual allegations it makes in support of its breach of contract claim.

fact reasonably relies on the misrepresentation, and (4) the party does so to its detriment. *See id.* As UBI has adequately pleaded its legal fraud claim, its equitable fraud claim requiring a lesser showing also meets the pleading threshold.

## V.     KDDI Corporation's Motion to Dismiss

KDDI Corp. has moved under Fed. R. Civ. P. 12(b)(2) to dismiss counts eight, nine, ten, and eleven on the ground that the Court lacks personal jurisdiction over it.  In the alternative, KDDI Corp. contends that these counts should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted.

With respect to personal jurisdiction, KDDI Corp. contends that UBI has only asserted that the Court has specific jurisdiction over it, and that the contacts with New Jersey it relies upon are insufficient to warrant the Court's exercise of jurisdiction in this case because they occurred after UBI's causes of action arose.  (KDDI Corp. Br. 4-5.)  UBI views those contacts differently, as ongoing manifestations of a parent-subsidiary plan to misappropriate UBI's customer base for their own business purposes.

### A.     Standard of Review under Fed. R. Civ. P. 12(b)(2)

Under Fed. R. Civ. P. 12(b)(2), a defendant may move for dismissal of a complaint for lack of personal jurisdiction.  The plaintiff bears the burden of demonstrating facts establishing personal jurisdiction when it is challenged.  *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).  Where the Court does not hold an evidentiary hearing regarding personal jurisdiction, the plaintiff need only make out a prima facie case of jurisdiction.  *Id.* (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)).  In evaluating the plaintiff's showing, the Court must "'accept the plaintiff's allegations as true'" and "'construe disputed facts in favor of the plaintiff.'"  *Id.* (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318

F.3d 446, 457 (3d Cir. 2003)).  The Court may revisit the issue of personal jurisdiction, however, "if it appears that the facts alleged to support jurisdiction are in dispute."  *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).  Ultimately, personal jurisdiction over a defendant must be established by a preponderance of the evidence.  *See id.* at 142 n.1, 146.

###### B.   Personal Jurisdiction over KDDI Corporation

"A federal court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of the state."  *Carteret Sav. Bank*, 954 F.2d at 144-45 (citation and internal quotation marks omitted).  *See also* Fed. R. Civ. P. 4(k).  New Jersey authorizes the exercise of personal jurisdiction "to the limits of the Fourteenth Amendment due process protection."  *Carteret Sav. Bank*, 954 F.2d at 145.  *See also* N.J. Ct. R. 4:4-4.  Satisfying due process requirements, in turn, calls for the Court to evaluate "whether the defendant has 'certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *HS Real Co. v. Halpern*, 526 F. App'x 203, 205 (3d Cir. 2013) (non-precedential) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Court can assess proffered contacts "in the context of general jurisdiction or specific jurisdiction."  *Metcalfe*, 566 F.3d at 334.  General jurisdiction exists where the defendant has "continuous and systematic contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action."  *Id.* (citations omitted).  Specific jurisdiction exists where "the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Thus, "[i]f the defendant maintain[s] continuous and substantial forum affiliations,' then general jurisdiction exists.  .  .  .  If the

defendant's contacts fall short of that standard, then at least one contact must give rise or relate to the plaintiff's claim." *O'Connor*, 496 F.3d at 321 (citation and internal quotation marks omitted).

Here, UBI asserts that the Court has specific jurisdiction. For specific jurisdiction to exist, (1) "the defendant must have 'purposefully directed [its] activities' at the forum," (2) "the litigation must 'arise out of or relate to' at least one of those activities," and (3) if the first two requirements are met, the exercise of jurisdiction must "otherwise 'comport[] with "fair play and substantial justice." *Id.* at 316-17 (first alteration in original) (citations omitted). The Third Circuit takes a flexible approach with respect to the required connection between the contacts and the litigation, but does assess (a) whether the plaintiff's claim would not have arisen in the absence of the defendant's contacts, and (b) whether something more exists – "a closer and more direct causal connection than that provided by the but-for test," which should be applied with reference to the "reciprocity principle" governing specific jurisdiction. *O'Connor*, 496 F.3d at 319, 321-23.

Where intentional torts are involved, a modified test derived from *Calder v. Jones*, 465 U.S. 783 (1984), holds personal jurisdiction "proper over nonresident defendants that committed an intentional tort outside the forum, the unique effects of which caused damage to the plaintiff within the forum." *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 256 (3d Cir. 1998). Under the "effects" test, jurisdiction is proper where (1) the defendant committed an intentional tort, (2) the plaintiff felt the brunt of the harm caused by the tort in the forum state, such that the forum "can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort"; and (3) the defendant "expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Id.*

UBI alleges that KDDI Corp. attended three meetings with it in the state of New Jersey, and that at two of those meetings KDDI Corp. took steps to further the plan it made with KDDI America to take away UBI's customers.  (*See* SAC ¶¶ 118-23; 135-41.)  UBI also contends that, along with the meetings, KDDI Corp. directed and participated in various improper conduct throughout the parties' relationship.  (*See* SAC ¶¶ 117-23, 135, 140, 329-34, 348-49, 403, 407.) It alleges that KDDI Corp. gave specific direction to KDDI America on matters constituting violations of its arrangements with UBI (*see, e.g., id.* ¶¶ 96-97).  In view of, in particular, UBI's allegations about the three meetings in New Jersey that KDDI Corp. attended, and given that UBI has sought to obtain jurisdictional discovery [*see* D.E. 51], the Court concludes that UBI has demonstrated reason for a limited inquiry in this respect.  *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (citations omitted) (providing that jurisdictional discovery should be permitted "unless the plaintiff's claim is 'clearly frivolous,'" and that "[i]f a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite contacts . . . the plaintiff's right to conduct jurisdictional discovery should be sustained").

KDDI Corp. characterizes its attendance at the New Jersey meetings as attempts to resolve disputes that had already arisen between its subsidiary and UBI, that is, post-injury conduct not relevant to the minimum contacts evaluation.  *See, e.g., Rocke v. Pebble Beach Co.*, 541 F. App'x 208, 212 (3d Cir. 2013) (non-precedential) (quoting 16 Moore's Federal Practice – Civil § 108.42 (3d ed. 2010) ("Generally, 'the proper focus in the specific jurisdiction analysis is on those contacts leading up to and surrounding the accrual of the cause of action. Later events are not considered.'").  It brings up UBI's theory that KDDI Corp. acted wrongfully from the beginning of the parties' relationship, *i.e.*, that the defendants never intended to perform their

obligations. In opposing jurisdictional discovery, KDDI Corp. has maintained that UBI attended the very meetings it invokes as a basis for personal jurisdiction, so no further inquiry is needed. UBI counters that its argument is not so cabined, and that the wrongful conduct continued throughout the summer and fall of 2012; in this rendering of events, the alleged wrongful conduct was ongoing at the time KDDI Corp. attended the meetings.  The Court declines to weigh in on what appears to be a factual dispute, and will permit UBI leave to conduct limited, targeted jurisdictional discovery. Further, to the extent KDDI Corp. argues that UBI should already be aware of the character and content of the New Jersey meetings because it attended them, this too takes too limited a view of information that is relevant to a personal jurisdiction inquiry; for example, the circumstances surrounding KDDI Corp.'s participation in the meetings may shed light on why it was there.

### C.    <u>KDDI Corporation's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)</u>

Because the Court will permit limited jurisdictional discovery, the specific boundaries of which are to be determined by Magistrate Judge Waldor upon application of UBI,[10] the Court will not at this time reach KDDI Corp.'s alternative arguments for dismissal beyond noting that the aiding and abetting breach of fiduciary duty claims embodied in counts eight and nine must be dismissed because they require the existence of a fiduciary duty. *See Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 764 (D.N.J. 2013) (Hillman, J.).  As discussed above, UBI has not sufficiently pleaded that KDDI America had any such duty and KDDI Corp.'s motion to dismiss is granted in part as to those counts.  The remainder of KDDI Corporation's motion to

---

[10] In view of the Court's dismissal of certain claims, the scope of UBI's focused inquiry directed to the nature of KDDI Corporation's contacts with New Jersey will necessarily be narrower than when it filed its motion for jurisdictional discovery.

dismiss is denied without prejudice to renewal upon application to Judge Waldor after conclusion of the jurisdictional discovery.

**VI.**      **Conclusion**

For the foregoing reasons, KDDI America's partial motion to dismiss is GRANTED IN PART insofar as counts four and five are dismissed, and DENIED IN PART insofar as it seeks dismissal of counts six and seven, and KDDI Corp.'s motion to dismiss is GRANTED IN PART insofar as the aiding and abetting claims in counts eight and nine are dismissed, and DENIED IN PART as discovery may go forward on UBI's assertion that this Court has personal jurisdiction over KDDI Corp.  An appropriate order will issue.


                                          /s/ Katharine S. Hayden
Date: June 30, 2014                       Katharine S. Hayden, U.S.D.J.

34